1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

**EASTERN DIVISION**

11

12  SHAREN EAVENSON,                    )   NO. EDCV 09-1131 SS
                                        )
13                  Plaintiff,          )
                                        )
14          v.                          )
                                        )   **MEMORANDUM DECISION AND ORDER**
15  MICHAEL J. ASTRUE,                  )
    Commissioner of the Social          )
16  Security Administration,            )
                                        )
17                  Defendant.          )
    _____ )

18

19                                  **I.**

20                            **INTRODUCTION**

21

22      Sharen Eavenson ("Plaintiff") brings this action seeking an order

23  to overturn the decision of the Commissioner of the Social Security

24  Administration ("Commissioner" or the "Agency") denying her application

25  for Disability Insurance Benefits ("DIB") and Supplemental Security

26  Income ("SSI") benefits, and to award DIB and SSI benefits.  In the

27  alternative, Plaintiff seeks a remand for further proceedings and the

28  award of costs and attorney's fees.  The parties consented, pursuant to

    28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States

Magistrate Judge.  This matter is before the Court on the parties' Joint Stipulation ("Jt. Stip."), filed on February 8, 2010.  The Court has jurisdiction to review the final decision of the Commissioner pursuant to 42 U.S.C. §§ 405(g); 1383(c).  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB benefits on March 3, 2006.  (AR 45-48).  The Commissioner denied her initial claim on August 1, 2006.  (AR 49-53).  Plaintiff filed a Request for Reconsideration on September 28, 2006.  (AR 54).  On March 30, 2007, this request was denied.  (AR 55-60).  Plaintiff then filed a timely Request for Hearing, which was held before an Administrative Law Judge ("ALJ") on July 28, 2008.  (See AR 28-44).  The ALJ returned an Unfavorable Notice of Decision on September 2, 2008.  (AR 17-27).  Plaintiff filed a Request for Review of Administrative Hearing Decision on September 16, 2008.  (AR 16).  The Unfavorable Amended Decision was issued on May 12, 2009.  (AR 4-14).  The Appeals Council denied Plaintiff's subsequent Request for Review on May 20, 2009.  (AR 1-3).  Plaintiff commenced the present action on June 6, 2009.  (AR 1-3).

## III.

### FACTUAL HISTORY

Plaintiff, who is fifty-five years old, alleges disability due to back pain and bipolar disorder.  (AR 92, 284); (see also 123-38).  She

2

currently resides with family and asserts that she has not been able to work since the onset date of December 30, 2005.  (AR 90).

**A.    Relevant Medical History[1]**

    **1.    Morongo Basin Mental Health**

    Plaintiff first visited Morongo Basin Mental Health in 1999.  (See AR 188-193).  At that time, Donna Wagner, M.S., evaluated Plaintiff and conducted a Clinical Assessment before referring Plaintiff to Dr. Payne for possible medication.  (AR 193).  In the Clinical Assessment, Ms. Wagner made a handwritten notation that read, "need to rule out substance abuse." (Id.).  Ms. Wagner also diagnosed Plaintiff according to Diagnostic and Statistical Manual of Mental Disorders-IV-TR method, giving Plaintiff a GAF of "50/60." (AR 189).  A doctor at Morongo Basin Mental Health confirmed this diagnosis.  (Id.).

    In February 2007, Dr. Sean R. Thomas, Plaintiff's primary care physician who specializes in pediatrics, women's health and general care, referred Plaintiff to Morongo Basin Mental Health for a mental health clinical evaluation for her disability forms.  (AR 245, 289, 293); (see, e.g., AR 274).  A clinician examined Plaintiff and completed an intake form.  (AR 291).  The clinician then referred Plaintiff to a

---

    [1]    As one of the material issues in this dispute is the label of certain physicians, the Court refrains from organizing Part III.A by treating, examining, and consulting physicians.  The Court addresses the legal designation of physicians, namely Dr. Puglisi, in the discussion, Part VII.A.

psychologist, Dr. Sarah Rushbrook, for an Adult Clinical Assessment on February 28, 2007.  (Id.).  The clinician stated the reason for Plaintiff's visit was "needs help with SSI." (AR 295).  Dr. Rushbrook opined that Plaintiff suffered from major depression, but declined to find that she had any type of developmental, physical, or cognitive disability.  (AR 289, 291).  Dr. Rushbrook also recognized that Plaintiff has an alcohol problem.  (AR 289).  According to Dr. Rushbrook, Plaintiff had a GAF of 40 at the time of examination.  (AR 289).  Dr. Rushbrook submitted a preliminary evaluation form, but declined to prescribe medication.  (See id.).

On March 2, 2007, licensed clinician Linda Murphy, M.H.S., examined Plaintiff before her appointment with Dr. Puglisi.  (See AR 287).  Ms. Murphy noted that Plaintiff exhibited signs of major recurrent depression and alcohol problems.  (Id.).  Ms. Murphey assigned Plaintiff a GAF of 40/45.  (Id.).

Plaintiff saw Dr. Augustin Puglisi on June 1, 2007. (AR 284-285). He performed an intake assessment of Plaintiff for an Adult Psychiatric Evaluation.[2]  (Id.).  Dr. Puglisi recorded Plaintiff's self-reported depression, excess sleep, withdrawn behavior, and loss of appetite.  (AR 284).  He gave Plaintiff a GAF score of "40/45." (Id.).  Dr. Puglisi also noted Plaintiff's past alcohol abuse.  (Id.).  However, he considered Plaintiff's appearance, perceptions, thought process, thought content, and memory to be within normal limits.  (Id.).  Dr. Puglisi

_____

[2]   Dr. Puglisi labeled Plaintiff's June 1, 2007 visit an intake evaluation.  On an October 9, 2007 notation he referred to the June visit calling it an "initial eval [sic]."  (AR 281).

4

concluded that Plaintiff was well-oriented with "good" insight and judgment. (Id.).

Plaintiff then missed her follow-up appointments with Dr. Puglisi. (See id.).  However, on July 31, 2007, Plaintiff requested medicine. (See AR 283) ("[Plaintiff] requesting meds [sic].").  Dr. Puglisi did not prescribe any medicine, but gave Plaintiff some samples of Lexapro.[3] (Id.).

On October 9, 2007, Plaintiff saw Dr. Puglisi for the first time since the initial intake evaluation on June 1, 2007.  (AR 281).  At this time, Dr. Puglisi informed Plaintiff that until Plaintiff was compliant with treatment for three months, which presumably includes not missing her appointments, Dr. Puglisi would not complete the disability paperwork.  (Id.).  Evidence from Dr. Thomas's reports indicates that Dr. Puglisi also refused to prescribe medication because he "did not feel [Plaintiff] was bipolar."  (AR 307).

After her final visit with Dr. Puglisi, Plaintiff complained to Dr. Thomas that she thought Dr. Puglisi was "a joke" and "just saw her for a few minutes."  (AR 307).  Consequently, in January 2008, Plaintiff requested a transfer from Dr. Puglisi to another psychiatrist, Dr. Kinne Tevis.  (AR 279).

---

[3] Lexapro is an "antidepressant medication used to treat depression and a variety of other mental/mood disorders."  Web MD, Drugs & Medications – Lexapro Oral, http://www.webmd.com/drugs/drug-63990-Lexapro+Oral.aspx?drugid=63990&drugname=Lexapro+Oral&source=2 (last visited Mar. 20, 2010).

Dr. Tevis saw Plaintiff briefly on three occasions in February, May, and April 2008.  He did not, however, provide an opinion regarding Plaintiff's RFC.  (AR 278-79, 299-300).

## 2.   Primary Care Physician

By all accounts, Dr. Thomas is Plaintiff's primary care physician. (See, e.g., AR 293) (explaining that Plaintiff had not visited Morongo Health Clinic because Dr. Thomas had been treating her for a couple of years); (AR 251) (referring to Dr. Thomas as Plaintiff's primary care physician in Dr. Jordan's report).   Dr. Thomas has been treating Plaintiff since April 5, 2005.  (AR 246).  He did not start treating her for bipolar disorder until August 11, 2006, when he prescribed Seroquel.[4]  (AR 245).  On the same day that Dr. Thomas started treating Plaintiff for bipolar disorder, he completed her Doctor's Certificate Claim for Disability Insurance Benefits.  (See AR 245-46).  Dr. Thomas omits any mention of Plaintiff's alcohol or substance abuse.

\\

\\

\\

\\

\\

---

[4]   Seroquel is used to treat mental and mood disorders such as depression, bipolar disorder, and schizophrenia.   It contains Quettiapine, which is an anti-psychotic.  Web MD, Drugs & Medications www.webmd.com/drugs/drug-4718-Seroquel+Oral.aspx?drugid=4718&drugname=Seroquel+Oral&source=2 (last visited Mar. 30, 2010).

### 3.   Consultative Physicians

a.   Dr. Kent Jordan

At the request of the Department of Social Services, Dr. Kent Jordan, Board certified and Diplomat of American Board of Psychiatry and Neurology, examined Plaintiff and conducted a Complete Psychiatric Evaluation. (AR 250-54). He submitted the summary report on March 10, 2007. (See id.).

Dr. Jordan observed, "[Plaintiff] exhibited mild hand tremors. Her eyes were significantly red and injected and bloodshot. [Plaintiff] had difficulty remaining seated." (AR 250). Dr. Jordan considered Plaintiff a "poor historian . . . especially regarding . . . her substance abuse." (Id.). She was "inconsistent" and "vague and evasive" on this point. (Id.). Plaintiff admitted getting a DUI in 2004 and being a heavy drinker when she was younger. (AR 251). She also told the doctor that she drank brandy on the weekends. (Id.). She said her last drink was three weeks ago, but "she was very vague about this." (Id.). Plaintiff has not sought treatment for her past drug and alcohol use or attended any twelve-step programs. (Id.).

Dr. Jordan also reported many observations that he considered indicative of substance abuse. (See 250-252). "[Plaintiff] looked much older than her stated age consistent with chronic illness or chronic substance abuse." (AR 252). However, "[Plaintiff] has no history of any chronic illness." (Id.). "[Plaintiff's] speech abnormalities [jerky and irregular, increased rate of speech, and increased amount of speech]

1  were consistent with significant anxiety and also with stimulant abuse."
2  (Id.).  Plaintiff expressed irritation and anger when questioned about
3  substance abuse.  (Id.).  "[Plaintiff's] highly increased reactivity of
4  highly labile and anxious and irritable affect were consistent with
5  ongoing substance abuse."  (Id.).  Plaintiff also had impaired memory
6  due to her confused and disorganized thinking, which Dr. Jordan believed
7  was consistent with substance abuse.  (See id.).  Dr. Jordan also noted
8  Plaintiff's probable substance abuse on Axis I of the Diagnosis by DSM-
9  IV.  (Id.).  He thought it likely that she abused stimulants as well as
10  alcohol.  (Id.).  On Axis V, he gave her a GAF of 55 to 60.  (Id.).

11

12      In conclusion, Dr. Jordan found that Plaintiff's "depression and
13  anxiety are most likely explained by chronic polysubstance abuse."
14  (Id.).  Due to the effects of polysubstance abuse, Plaintiff's RFC was
15  "significantly impaired in many areas."  (AR 254).  Dr. Jordan referred
16  to Plaintiff's impairments as "substance-induced psychiatric problems."
17  (AR 253).  He wrote, "If [Plaintiff] could maintain total and sustained
18  sobriety for a prolonged period of time, the prognosis would probably
19  significantly improve."  (AR 254).

20

21          b.   Dr. David Bedrin

22

23      At the request of the Department of Social Services, Dr. David
24  Bedrin, Board certified psychiatrist and neurologist, examined Plaintiff
25  and conducted a Complete Psychiatric Evaluation.  (AR 205-09).  He
26  submitted the summary report on June 21, 2006. (See id.).

27

28  \\

1    Plaintiff arrived thirty minutes late to her examination with Dr.
2  Bedrin.  (AR 205).  Despite the tardiness, Dr. Bedrin found Plaintiff
3  to be generally well-functioning.  (See AR 207-08).  He reported that
4  she was an adequate historian, has no difficulty remembering
5  instructions, has "no impairments in the ability to withstand the stress
6  and pressures associated with an eight-hour workday," and is capable of
7  handling her own funds.  (AR 208).  Dr. Bedrin also noted that Plaintiff
8  "related well to this interviewer." (Id.).  Plaintiff reported to Dr.
9  Bedrin that she goes shopping and drives herself." (Id.).

10
11    Dr. Bedrin noted Plaintiff's history of substance abuse and
12  possible continued use.  (See AR 206-07) (recording Plaintiff's teenage
13  drinking habits and her lack of attendance at any drug or alcohol
14  treatment program).  Plaintiff admitted to Dr. Bedrin that her father
15  had alcohol problems and that she was once arrested for a DUI.  (Id.).
16  On the DSM-IV scale, Dr. Bedrin noted "history of alcohol abuse" on Axis
17  I and gave Plaintiff a GAF of "57" on Axis V.  (AR 208).

18
19       c.   Dr. K.J. Loomis
20
21    State agency reviewing physician, Dr. K.J. Loomis, reviewed the
22  medical evidence on July 14, 2006.  (AR 216-29).  Dr. Loomis found
23  "pertinent symptoms, signs, and laboratory findings that substantiate
24  the presence of [bipolar disorder]." (AR 219).  He also determined that
25  Plaintiff suffered from another "medically determinable impairment,"
26  alcohol abuse.  (AR 222).

27
28

### 4.   Medical Experts

a.   Dr. David Peterson

Medical expert and Board certified clinical psychologist Dr. David Peterson testified at Plaintiff's hearing by teleconference.  (AR 11, 35-40).  Before testifying, he reviewed the record and listened to Plaintiff's testimony. (See AR 11, 29-35).  Dr. Peterson testified that medical evidence indicated Plaintiff suffered from bipolar disorder, but that this disorder was induced by polysubstance abuse.  (Id.).  Dr. Peterson cautioned the ALJ against finding bipolar disorder without first ruling out substance abuse, because "[substances] could explain exclusively the symptoms reported."  (AR 37).  Dr. Peterson explained:

> [W]ay back in June of '99 . . . social worker that said that substance abuse should be ruled out in the case.  June 21st of '06 drug and alcohol abuse were denied.  But there was a report of rather large quantities of alcohol that were consumed and so there appeared to be a lack of awareness in terms of the quantity consumed and it being a problem with respect to alcohol. . . . Further, . . . the March 10th '07 record [shows] clinical impressions that raised concern regarding alcohol and substance abuse.  On page 2 of that record they refer to DUI's in the last three years.

\\
\\

10

1    (AR 36-37).  Dr. Peterson concluded:

2

3        I can't say with any certainty that, which of these

4        diagnoses is true, but I can definitely say that the record

5        suggests to me that we can't rule out drug and alcohol

6        abuse as relevant in the case without some objective

7        evidence for this type of toxicology or other treating

8        records relating to sober living.

9

10   (AR 37).

11

12              b.   Dr. H.N. Hurwitz

13

14       On March 20, 2007, Dr. H.N. Hurwitz reviewed Plaintiff's medical

15   records and the opinions of her previous physicians.  (AR 259-262).

16   Based on the evidence of Plaintiff's polysubstance abuse, Dr. Hurwitz

17   did not believe that Plaintiff qualified as disabled.  (AR 261).  He

18   found that "[Plaintiff's] highly increased reactivity of highly

19   labile/anxious/irritable affect were consistent w/ongoing substance

20   abuse."  (Id.).  He also noted her "probable polysubstance abuse" on

21   Axis I of the DSM-IV diagnosis.  (Id.).

22

23       Dr. Hurwitz reviewed Dr. Loomis' prognosis and explicitly agreed

24   with his conclusions, stating in part:

25

26       Agree with above.  Objective information indicates minimal

27       impairment.   Psych CE finds  no worse than moderate

28       impairment secondary to bipolar disorder and alcohol abuse.

                                    11

The [Plaintiff] drives, runs errands, manages money and cares for self. [Plaintiff] is able to maintain concentration, persistence and pace throughout a normal workday/workweek as related to simple tasks. The claimant is able to interact adequately with coworkers and supervisors but may have difficulty dealing with the demands of general public contact. [Plaintiff] is able to make adjustments and avoid hazards in the workplace.

(AR 260) (emphasis added).

### 4.   Plaintiff's Testimony

Plaintiff repeatedly described her chief complaint as "depression and bipolar" disorders. (See, e.g., AR 92, 99-106). Plaintiff told this to Dr. Jordan when he examined her, as well as Drs. Thomas, Puglisi, and Tevis. (AR 250, 276, 284, 293). For example, on April 23, 2007, Dr. Thomas recorded, "[Plaintiff] requests SSI paperwork filled out for 'being bipolar'." (AR 276); (see also AR 238) (requesting a written diagnosis of bipolar disorder for her social security disability forms).

Plaintiff characterized her depression as rendering her unable to get out of bed and unmotivated to engage in activities. (AR 291). She reported that she "sleep[s] too much, for days" and is usually "totally exhausted." (AR 132). Indeed, Plaintiff claims that she is only awake for a few hours a day. (AR 131) ("I don't wake up !!!! [sic] When I do wake up for a few a hrs [sic] I try to do all the things that were

neglected.").   According  to  Plaintiff,  she  occasionally  requires
personal hygiene reminders from her family, such as "do you want to wash
your clothes?" or "would you like to take a shower?"  (AR 159).  Before
appearing at the hearing, Plaintiff's brother "told [Plaintiff] to be
damn sure [she] took a shower."  (AR 33).

Plaintiff admitted that she was arrested for a DUI in 2004.  (AR
251).  Plaintiff also indicated that she drank heavily in her teens and
early twenties.  (See AR 206); (see also AR 33).  She claims that, since
that time, she drinks only on the weekends, but admits that she drinks
straight brandy and finishes a whole pint on her own.  (AR 206, 251);
(see also AR 33).  Plaintiff generally denies having any problem with
substance abuse.  (AR 33-34).  When the ALJ questioned her about being
drug and\or alcohol dependant, she responded, "I think he's got somebody
-- else's case."  (AR 34).

**IV.**

**FIVE-STEP SEQUENTIAL EVALUATION  PROCESS**

To qualify for disability benefits, a claimant must demonstrate
a medically determinable physical or mental impairment that prevents him
from engaging in substantial gainful activity[5] and that is expected to
result in death or to last for a continuous period of at least twelve
months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing
42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant

---

[5]   Substantial gainful activity means work that involves doing
significant and productive physical or mental duties and is done for pay
or profit.  20 C.F.R. §§ 404.1510, 416.910.

incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

\\

14

1      (5)   Is the claimant able to do any other work?  If not,

2            the claimant is found disabled.  If so, the claimant

3            is found not disabled.

4

5   Tackett, 180 F.3d at 1098-99; see also 20 C.F.R. §§ 404.1520(b)-(g)(1),

6   416.920(b)-(g)(1); Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th

7   Cir. 2001) (citations omitted).

8

9        The claimant has the burden of proof at steps one through four, and

10   the Commissioner has the burden of proof at step five.  Bustamante, 262

11   F.3d at 953-54.  If, at step four, the claimant meets his burden of

12   establishing an inability to perform past work, the Commissioner must

13   show that the claimant can perform some other work that exists in

14   "significant numbers" in the national economy, taking into account the

15   claimant's residual functional capacity ("RFC"),[6] age, education, and

16   work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at

17   721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may

18   do so by the testimony of a VE or by reference to the Medical-Vocational

19   Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2

20   (commonly known as "the Grids").  Osenbrock v. Apfel, 240 F.3d 1157,

21   1162 (9th Cir. 2001).  When a claimant has both exertional (strength-

22   related) and nonexertional limitations, the Grids are inapplicable and

23   the ALJ must take the testimony of a VE.  Moore v. Apfel, 216 F.3d 864,

24   869 (9th Cir. 2000).

25

26        [6]   Residual functional capacity is "the most [one] can still do

27   despite [one's] limitations" and represents an assessment "based on all

     the relevant evidence in [one's] case record."  20 C.F.R. §§

28   404.1545(a), 416.945(a).

When substance abuse is involved, the ALJ must include an extra analysis in his determination of disability.[7] As the Ninth Circuit described in Bustamante, the five-step sequential evaluation must first be conducted "without separating out the impact of alcoholism or drug addiction." 262 F.3d at 955. If after conducting this inquiry, the ALJ concludes that an individual is disabled and there is medical evidence of his drug addiction or alcoholism, then it must be determined whether the claimant would still be found disabled if he stopped using alcohol or drugs. Id. ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.") (citing 20 C.F.R. §§ 404.1535, 416.935(b)(1)). At this stage, the claimant would bear the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination. Ball v. Massanari, 254 F.3d 817, 822-23 (9th Cir. 2001); see also Sousa v. Callahan, 143 F.3d 1240, 1245 (9th Cir. 1998) (remanding to give claimant an opportunity to present evidence relevant to this issue).

---

[7] In 1996, Congress enacted Section 105 of the Contract with America Advancement Act, including a subsection entitled "Denial of Disability Benefits to Drug Addicts and Alcoholics." 42 U.S.C. § 423(d)(2)(C). This statute and the regulations promulgated thereunder operate to deny social security disability benefits to claimants whose alcoholism or drug addiction is a contributing factor material to the determination of his or her disability. See 20 C.F.R. § 416.935. Section 423(d)(2)(C) provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

# V.

## ALJ'S DECISION

At step one, the ALJ found that Plaintiff "has not engaged in substantial gainful activity since December 30, 2005, the alleged onset date." (AR 10).

At step two, the ALJ considered Plaintiff's following impairments "severe": "substance abuse addiction and substance-induced depression (20 CFR 404.1520(c) and 416.920(c))." (Id.). The ALJ relied on Board certified psychiatrist and neurologist, Dr. Jordan's, examination of Plaintiff in which he concluded Plaintiff likely had past and ongoing polysubstance abuse. (Id.). In rejecting Dr. Thomas' conclusions, the ALJ remarked that while Dr. Thomas may be [Plaintiff's] primary care physician, he lacked the expertise of Board certified specialists who examined Plaintiff. (Id.).

At step three, the ALJ determined that Plaintiff's impairments, including the substance abuse disorder, "medically equal section 12.09(B) of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d))." (AR 11). The ALJ relied heavily on the opinions and testimony of Dr. Peterson, Board certified and licensed clinical psychologist, in reaching his conclusion. (Id.). He also relied on Plaintiff's remarks to Dr. Jordan that she "was a heavy drinker in her late teens and early 20s [sic]." (Id.). The ALJ remarked, "She said she drank on the average of every two weeks and her last alcohol use was supposedly two days ago." (Id.). Finally, the ALJ relied on evidence of her DUI as indicative of a substance abuse problem, especially in

17

conjunction with her own admissions, examining doctors' opinions, and Dr. Peterson's testimony.  (AR 12).

The ALJ concluded that Plaintiff's substance abuse materially affected her RFC.  (AR 11-12).  First, he found that there is an underlying medically determinable impairment causing Plaintiff's symptoms of depression and anxiety.  (AR 12).  Second, the ALJ found that the intensity, persistence, and limiting effects of the underlying depression were due to Plaintiff's substance abuse.  (Id.) (emphasis added).

The ALJ did not find Plaintiff's statements "sufficiently credible to determine [Plaintiff] would have a severe mental impairment in the absence of alcohol."  (Id.).  The ALJ specifically noted the fact that Plaintiff asked Dr. Thomas on April 4, 2007, to report that she was bipolar.  (AR 13).  Finally, the ALJ considered Plaintiff's aunt and sister's statements, but did not find that they established any different conclusions.  (AR 14).  Moreover, he wrote, "Although lay persons can certainly offer opinions on another's medical condition and functional ability, their testimony is far less persuasive on those same issues than the medical evidence and opinions relied on herein, which is also offered without prejudice in [Plaintiff's] favor of family and friends."  (Id.).

Accordingly, the ALJ concluded, "If [Plaintiff] stopped the substance use, the remaining limitations would not cause more than a minimal impact on her ability to perform basic work activities; therefore [Plaintiff] would not have a severe impairment or combination

18

of impairments [affecting her RFC]." (AR 13-14). Thus, Plaintiff "has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision." (AR 14).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); Reddick, 157 F.3d at 720. It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21.

## VII.

## DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed for two reasons.   First, Plaintiff asserts that the ALJ did not "properly consider the treating psychiatrist's opinion." (Jt. Stip. at 2).  This claim is predicated on the assumption that Dr. Puglisi is a treating physician.   However, as discussed below, the Court finds that Dr. Puglisi qualifies as only an examining physician.   Second, Plaintiff contends that the ALJ's determination that "Plaintiff mental condition was not a severe impairment" was "flawed."  (Jt. Stip. at 2, 9). Plaintiff further claims that the ALJ "failed to provide substantial evidence" that Plaintiff's functional limitations would actually be minimal absent substance abuse. (Jt. Stip. at 9).  To the contrary, the ALJ discussed the evidence at length in his decision and cited to the record which was replete with supporting evidence. (<u>See</u> AR 7-19).

## A.  **The ALJ Properly Considered Dr. Puglisi's Opinion**

Plaintiff argues that the ALJ materially erred by relying on the consultative and the non-examining consultative physicians opinions over portions of Dr. Puglisi's intake note. (Jt. Stip. at 2).  Plaintiff further contends that the ALJ disregarded Dr. Puglisi's intake note without providing "specific and legitimate reasons . . . supported by substantial evidence." (Jt. Stip. at 4).  This Court disagrees.

\\

\\

**1.   Dr. Puglisi Is An Examining Physician Entitled To No More Weight Than Examining Physicians Drs. Bedrin And Jordan**

Plaintiff contends that the ALJ failed to properly consider the findings of Dr. Puglisi by not according him the weight of a treating physician.  (Jt. Stip at 3) (citing <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1955)(as amended)).  This Court disagrees.

A doctor only qualifies as a treating physician if the doctor, in fact, has a treating relationship with the plaintiff.  20 C.F.R. § 404.1502 defines a "treating source" in pertinent part as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and how has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).  .  .  .  We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of

1     your claim for disability.  In such a case, we will

2     consider the acceptable medical source to be a non-

3     treating source.

4

5 20 C.F.R. § 404.1502.

6

7  ALJ considered Dr. Puglisi's findings when he considered the

8 evidence as a whole. (<u>See</u> AR 10-14).  As the ALJ noted in his decision,

9 "[T]he undersigned has considered all symptoms and the extent to which

10 these symptoms can reasonably be accepted as consistent with the

11 objective medical evidence . . . [and] opinion evidence." (AR 12-13).

12 He specifically mentioned Plaintiff had Morongo Basin Mental Health

13 records dating back to 1999 that "showed the need to rule out substance

14 abuse." (AR 11).  The ALJ discussed in detail Drs. Thomas, Jordan, and

15 Bedrin's examinations and Dr. Peterson's medical opinions. (<u>See</u> AR 10-

16 14).

17

18  Dr. Puglisi did not have the kind of ongoing treatment relationship

19 with Plaintiff that would satisfy the definition of a treating

20 physician.  His relationship with Plaintiff reflects brief, infrequent

21 and limited evaluations. (<u>See</u> AR 281) ("Seen for initial eval [sic] and

22 not since.").  Plaintiff met with Dr. Puglisi once on June 1, 2007 for

23 an initial examination. (AR 284-85).  She then failed to show up for

24 her three subsequent appointments. (<u>See</u> AR 281-85, AR 283) ("Not seen

25 in 2 months.").  Indeed, Dr. Puglisi would not complete disability

26 paperwork for Plaintiff largely due to her inability to keep

27 appointments and follow a treatment plan. (AR 281) ("Informed

28

1   [Plaintiff] that this provider will not complete disability paperwork
2   until compliant.").

3

4       In addition, Plaintiff saw Dr. Puglisi at the behest of Dr. Thomas,
5   who was already treating her and prescribing medication, in order to
6   obtain a report in support of her claim for disability.  (AR 293)
7   ("Referred by Dr. Sean Thomas -- seen couple of years [sic].").  A
8   notation by Dr. Puglisi from August 3, 2007 reads, "[Plaintiff]
9   requesting dsbty [sic] excuse.").  This is further evidence that Dr.
10  Puglisi does not qualify as a treating physician because Plaintiff saw
11  him in order to obtain a disability form, rather than for actual
12  treatment (which Plaintiff was receiving from Dr. Thomas).[8]  (See, e.g.,
13  AR 96, 293, 302-07).  As the rule states: "We will not consider an
14  acceptable medical source to be [Plaintiff's] treating source if
15  [Plaintiff's] relationship with the source is . . . based . . . solely
16  on [Plaintiff's] need to obtain a report in support of [Plaintiff's]
17  claim for disability."  20 C.F.R. § 404.1502.

18

19

20

21      [8]  Further, Dr. Puglisi did not find Plaintiff to be bipolar.
22  According to Dr. Thomas's April 23, 2007 notes, Plaintiff requested "SSI
    paperwork filled out, [Plaintiff] states, 'for being bipolar.'" (AR
23  276).  As the ALJ wrote, "It is noteworthy to point out that [Plaintiff]
    asked Dr. Thomas on April 4, 2007, to report to Social Security that she
24  was disabled for "being bipolar[.]"  (AR 14, 276).  Moreover, Dr.
25  Thomas, Plaintiff's primary care physician, is the doctor who prescribes
    her medication.  (See, e.g., AR 302-07).  Indeed, Dr. Puglisi refused to
26  diagnose her as bipolar and offered her only samples of medication
    without a long term prescription.  (AR 283).  Evidence from Dr. Thomas's
27  reports further indicates that Dr. Puglisi "did not feel [Plaintiff] was
28  bipolar."  (AR 307).

Significantly, Plaintiff did not characterize Dr. Puglisi as her treating physician. (See AR 307). She complained about Dr. Puglisi to Dr. Thomas, referring to Dr. Puglisi as "a joke." (Id.). She also complained that Dr. Puglisi tried to change her medication after her "just saw [her] for a few minutes." (Id.). Dr. Puglisi's refusal to recognize a disease Plaintiff thought she had and his refusal to prescribe medication prompted Plaintiff to request a new doctor, Dr. Tevis. (AR 279). According to the evidence, Dr. Tevis appears to be Plaintiff's treating physician at Morongo Basin Mental Health, but neither Plaintiff nor the evidence indicates that Dr. Tevis ever filled out any disability questionnaires or offered an opinion on Plaintiff's behalf. (See AR 278-79, 299-300).

Dr. Puglisi's brief interaction with Plaintiff does not rise to the level of a treating physician, but rather an examining physician. The ALJ gave these records proper consideration and furthermore accorded appropriate weight to the consultative examiners, whose opinions were consistent with the record as a whole. See Thomas v. Banhart, 278 F. 3d 947, 957 (9th Cir. 2002)(opinions of non-treating\non-examining doctors may serve as substantial evidence where the opinions are based on independent clinical findings or other evidence in the record). Accordingly, it was not error for the ALJ to afford similar weight to the opinions of the other examining physicians, Drs. Jordan and Bedrin. See Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) ("the opinions of examining physicians are afforded more weight than those of non-examining physicians."); Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (holding that among equally weighted physicians' opinions, the ALJ "is responsible for resolving conflicts in medical testimony"

24

1  and "determining credibility").  The ALJ afforded the appropriate weight

2  to Dr. Puglisi's findings.

4  **2.    The ALJ Properly Rejected Dr. Puglisi's Opinion As Brief**

5  **And Conclusory**

7       The Ninth Circuit has held that "[t]he ALJ need not accept the

8  opinion of any physician, even a treating physician, if that opinion is

9  brief, conclusory, and inadequately supported by clinical findings."

10  Thomas, 278 F.3d at 957; Batson v. Comm'r of Soc. Sec., 359 F.3d 1190,

11  1195 (9th Cir. 2004); accord Matney v. Sullivan, 981 F.2d 1016, 1019

12  (9th Cir. 1992).   In interpreting the evidence and developing the

13  record, the ALJ "does not need to discuss every piece of evidence."

14  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003).

15  He need only discuss evidence that was "significant" and "probative."

16  Id. (holding that the ALJ "did not selectively analyze the evidence"

17  where the ALJ referred to a combination of medical reports without

18  specifically discussing a report of low probative value upon which the

19  ALJ did not rely).

21       The ALJ discussed Dr. Jordan's and Dr. Peterson's opinions in great

22  detail.  (See AR 11-14).   The ALJ indicated that he did not find Dr.

23  Thomas's opinions entirely credible because Dr. Thomas is not a

24  specialist.  (AR 12).   The ALJ also explained why he did not find

25  Plaintiff's "statements sufficiently credible to determine that her

26  disability is not materially caused by substance abuse." (AR 13).   He

27  also noted that he considered all opinion evidence, which would include

28  Dr. Puglisi's brief intake note.  (AR 12).

Here, the medical record at issue is an intake note recorded by Dr. Puglisi after Plaintiff's first visit on June 1, 2007. (Jt. Stip. at 3; see AR 284-85). An intake note does not necessarily receive a special, lesser, value, however this note falls squarely under the standard of "brief and conclusory." (See Thomas, 278 F.3d at 957). Indeed, the intake note hardly even qualifies as a opinion about Plaintiff's impairments because the doctor explicitly declined to give such an opinion or to prescribe medication. (AR 281, 283). He told Plaintiff, "[T]his provider will not complete disability paperwork until compliant [with treatment] for 3 months." (AR 281). Dr. Puglisi's intake note was based solely on one brief meeting with Plaintiff. (Id.). In his own words, the meeting was little more than "an initial eval [sic]." (Id.).

In stark contrast to the brevity of and lack of recorded clinical observation in Dr. Puglisi's intake note, the other examining physicians, Dr. Jordan and Dr. Bedrin, had very detailed reports. (See AR 250-54, 205-09); see also infra Part III.A.3.a-b. Moreover, each doctor supported his conclusions with independent clinical findings. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (holding that the opinion of an examining physician may itself be substantial evidence where it is based upon independent clinical findings); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

Plaintiff also relies on the GAF score of 40 that Dr. Puglisi recorded in the intake note. (See Jt. Stip. At 3). However, Dr. Puglisi actually noted a GAF of 40/45. (AR 284). This is significant because a GAF score above 40 could put Plaintiff in the next tier of

scores.  According to the Diagnostic and Statistical Manual of Mental Disorders-IV-TR, a GAF score of 31-40 may be indicated of "some impairment in reality testing or communication or major impairment in several areas, such as work . . . judgment, thinking, or mood." (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders-IV-TR at 32 (4th ed. 2000) (hereinafter, "DSM IV"). A GAF rating of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." See DSM IV at 34.

Regardless, the GAF score does not directly correlate to the RFC and is not dispositive in Social Security cases.  See 65 Fed. Reg. 50746, 50765 (August 21, 2000) (explaining that GAF scores are not directly correlative to Social Security severity assessments).  GAF scores consider non-medical factors which do not constitute work-related functional limitations, and therefore do not necessarily translate into functional limitations for the purpose of assessing Social Security disability. 65 Fed. Reg. 50746, 50765 (Aug. 21, 2000)("[GAF scale] does not have a direct correlation to the severity requirements in our mental disorder listings.")  It is only intended to be used to plan treatment and measure its impact.  See DSM IV at 32.  The ALJ's failure to refer to a GAF score does not, by itself, make the assessment inaccurate.  See Howard v. Comm'r of Social Security, 276 F.3d 235, 241 (6th Cir. 2002)("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."); see also Brewster v. Barnhart, 366 F. Supp. 2d 858, 876 (E.D. Mo.

1   2005)(citing <u>Howard</u>); <u>Quaite v. Barnhart</u>, 312 F. Supp. 2d 1195, 1200

2   (E.D. Mo. 2004)(citing <u>Howard</u>, 276 F.3d at 241 ).

3

4       Here, at least ten medical professionals examined Plaintiff and\or

5   her medical records.  (<u>See</u> <u>infra</u> Part.III.A.1-4).  Those that assigned

6   Plaintiff a GAF score each noted different scores.[9]  These scores range

7   from 40 to 60, highlighting the low probative value of this indicator.

8   <u>See</u> <u>Howard</u>, 276 F.3d at 241.

9

10      Therefore, Dr. Puglisi's intake note and the GAF score in the note

11  were not as relevant to the determination of Plaintiff's disability as

12  were the other medical opinions, which were more detailed and consistent

13  with the record.  Since the ALJ need only discuss evidence that was

14  significant and probative, it was not a material error for him to

15  decline to mention the observations contained in Dr. Puglisi's brief and

16  conclusory intake note.  <u>See</u> <u>Howard</u>, 341 F.3d at 1012.  No remand is

17  required.

18  \\

19  \\

20  \\

21  \\

22  \\

23

24

25

26      [9]   For example, Ms. Wagner gave Plaintiff a GAF of "50/60."  (AR
189).  Dr. Rushbrook gave Plaintiff a GAF of "about 40."  (AR 289).  Ms.
27  Murphy and Dr. Puglisi assigned Plaintiff a GAF of "40/45."  (AR 287,
284).  Dr. Jordan assigned Plaintiff a GAF of "55 to 60."  (AR 253).
28  Dr. Bedrin gave Plaintiff a GAF of "57."  (AR 208).

**3.    Even If Dr. Puglisi's Note Were Given Full Credit, The Outcome Would Be The Same**

Plaintiff implies that consideration of Dr. Puglisi's intake note would revive her disability claim. (AR 3-4, 8-9). The Court disagrees.

To the extent that the Court could construe the ALJ's failure to specifically mention Dr. Puglisi's intake note an error, it was a harmless error because it would not have affected the ALJ's ultimate determination. "[W]here the mistake was nonprejudicial to [Plaintiff] or irrelevant to the ALJ's ultimate disability conclusion," the mistake is a harmless error. Stout v. Comm'r of the Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006); see also Carmickle v. Comm'r of the Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008).

The ALJ discussed Dr. Jordan's and Dr. Peterson's clinical observations and conclusions in great detail. (See AR 11-14). He also referred to other examinations, such as Dr. Bedrin's, by date. (AR 11). The bulk of consultative and non-examining consultative physician opinion indicated a substance abuse problem. Dr. Puglisi's intake note reported "alcohol abuse" that could contribute to her mental health. (AR 284). Ms. Wagner, a clinician at Morongo Basin Mental Health, reached a similar conclusion writing, "need to rule out substance abuse." (AR 193). In Dr. Jordan's opinion, Plaintiff's "clinical picture was most consistent with chronic ongoing substance abuse." (AR 253). Dr. Jordan based this on Plaintiff's "mild hand tremors," red and bloodshot eyes, her "difficulty remaining seated," her mental disorientation, and her history of personal and familial substance

abuse.  (AR 250-52).  Dr Loomis concurred with Dr. Jordan conclusions when he read Dr. Jordan's observations.  (AR 222).  Dr. Peterson testified at length about the likelihood that Plaintiff had a substance abuse problem and how it affected the severity of her mental condition. (See AR 29-35).  In his opinion, the substance abuse "could explain exclusively the symptoms reported."  (AR 37).

The ALJ admitted in his decision that the evidence overwhelmingly indicated substance abuse.  (AR 10-12).  He wrote that medical records "as far back as 1999 . . . showed the need to rule out substance abuse," and concluded, "If [Plaintiff] stopped the substance abuse, the remaining limitations would not cause more than a minimal impact on her ability to perform basic work activities." (AR 11-12).  He also pointed to the complete lack of evidence proving otherwise.  (AR 13-14). Plaintiff produced "no evidence of current sobriety."  (Id.).  She "admi[tted] that she has not sought nor received any mental health treatment, not attended any 12-Step programs and has had no treatment for her drugs and alcohol."  (AR 14).  Finally, the ALJ noted that Plaintiff has never submitted to a random sobriety test to determine current levels of toxicity.  (Id.).

The ALJ also explained why he did not resolve conflicts in the medical evidence in favor of Dr. Thomas.  Where there is conflict, it is "solely the province of the ALJ to resolve the conflict."  Andrews, 53 F.3d at 1041; accord Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  The ALJ did not find Dr. Thomas entirely credible because Dr. Thomas is not a specialist.  (AR 12).  The ALJ also described Plaintiff's statements as not "sufficiently credible to determine that

her disability is not materially caused by substance abuse."  (AR 13).
He also noted that he considered all opinion evidence, which would
include Dr. Puglisi's brief intake note.  (AR 12).

Even if Dr. Puglisi's intake note were accorded more weight, it
merely says that Plaintiff was depressed and withdrawn, and puts
Plaintiff's GAF at "40/45."  (AR 284).  These conclusions do not
necessarily conflict with the findings of the other doctors.  Dr. Jordan
also reported Plaintiff experienced symptoms of depression.  (See AR
250-53).  Dr. Bedrin noted that Plaintiff appeared "depressed and her
affect was constricted."  (AR 207).  Dr. Loomis confirmed those
observations after reviewing the record and opined, "pertinent symptoms,
signs, and laboratory findings . . . substantiate the presence of
[bipolar disorder]."  (AR 219).  Dr. Peterson testified that the record
indicated that Plaintiff experienced depressive symptoms.  (AR 35-36).

The difference between Dr. Puglisi's brief note and the other
doctors' detailed explanations, is that the other doctors contribute the
severity of Plaintiff's mental impairments to substance abuse.  (See AR
208, 222, 253, 254, 261).  As Dr. Jordan summarized, "If [Plaintiff]
could maintain total and sustained sobriety for a prolonged period of
time, the prognosis would probably significantly improve."  (AR 254).

Taking into account the substantial evidence of substance abuse and
its materiality to Plaintiff's condition, the ALJ would not have come
to a different conclusion had he explained Dr. Puglisi's intake note in
his decision.  No remand is required.

**B.    The ALJ's Conclusions Regarding Plaintiff's Mental Impairment Were Proper**

Plaintiff contends that "[t]he ALJ has failed to provide substantial evidence that Plaintiff's mental impairments would be minimal in the absence of substance abuse." (Jt. Stip. at 10,11). Plaintiff contends that the ALJ has therefore committed a material legal error deserving of remand. (Jt. Stip. at 10). This Court disagrees.

In 1996, Congress enacted Section 105 of the Contract with America Advancement Act, including a subsection entitled "Denial of Disability Benefits to Drug Addicts and Alcoholics." 42 U.S.C. § 423(d)(2)(C).[10] This statute and the regulations promulgated thereunder operate to deny social security disability benefits to claimants whose alcoholism or drug addiction is a contributing factor material to the determination of his or her disability. See 20 C.F.R. § 416.935.[11]

Addressing the application of these provisions, the Ninth Circuit held in Bustamante, that the five-step sequential evaluation must first be conducted "without separating out the impact of alcoholism or drug

_____

[10]    Section 423(d)(2)(C) provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

[11]    Section 416.935(b)(1) provides that "[t]he key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."

addiction." 262 F.3d at 955.  If after conducting this inquiry, the ALJ concludes that an individual is disabled and there is medical evidence of his drug addiction or alcoholism, then it must be determined whether the plaintiff would still be found disabled if she stopped using alcohol or drugs.  Id. (citing 20 C.F.R. §§ 404.1535, 416.935).  At this stage, Plaintiff bears the burden of proving that her substance abuse is not a contributing factor material to the existence or severity of her disability determination.  Ball v. Massanari, 254 F.3d 817, 822-23 (9th Cir. 2001); see Parra v. Astrue 481 F.3d 742, 748 (9th cir. 2007); see also Sousa v. Callahan, 143 F.3d 1240, 1245 (9th Cir. 1998) (remanding to give claimant an opportunity to present evidence relevant to this issue).  Plaintiff failed to meet that burden here.

The ALJ noted that the record contained ample evidence of substance abuse and its material affect on Plaintiff's disability.[12]  (See AR 34) ("[The] medical records are just replete with doctors after doctors saying that [Plaintiff is] a drug dependant person and [she is] addicted to drugs."); see also infra Part VII.A.3 (explaining that the record contains substantial evidence that Plaintiff's mental health impairments result primarily from substance abuse).  At Plaintiff's hearing on July 28, 2008, Dr. Peterson, a medical expert and non-examining consultative physician, testified.  (AR 35-40).  When questioned by the ALJ about

---

[12]   Many mental health professionals also reached this conclusion. Dr. Puglisi's intake note reported "alcohol abuse" that could contribute to her mental health.  (AR 284).  Ms. Wagner, a clinician at Morongo Basin Mental Health, reached a similar conclusion writing, "need to rule out substance abuse."  (AR 193).  In Dr. Jordan's opinion, Plaintiff's "clinical picture was most consistent with chronic ongoing substance abuse."  (AR 253).

Plaintiff's limitations under "criteria B," Dr. Peterson responded that her limitations were "moderate to marked" when considering her substance abuse.  (AR 38).  However, Dr. Peterson explained, "[W]ith appropriate treatment [for substance abuse] symptoms would significantly improve. And so for activities of daily living I would anticipate that that would be mild to moderate [with regards to social functioning, concentration, and persistence]."  (AR 39).

The ALJ then questioned a vocational expert ("VE") about an individual with the same "mild to moderate" limitations as Plaintiff. (See AR 21-43).  The VE explained that such an individual could not perform skilled work, but could still perform "simple type of work with . . . no direct dealing with general public."  (AR 42).  As the Social Security Agency's standardized rating form clearly indicates, only a functional limitation of "marked" or "extreme" under the "B Criteria of Listings" is considered "a degree of limitation that satisfies the functional criterion" equating to a severe impairment. (AR 224).

Plaintiff failed to show that absent her substance abuse she would still be unable to perform unskilled work.  Since she did not sustain her burden to rebut the substantial evidence described above, the ALJ was prohibited from granting disability benefits.  See 42 U.S.C. §§ 423(d)(2)(C), 1382.  Congress has mandated that "an individual shall not be considered to be disabled for purposes of [benefits under Title II or Title XVI of the Social Security Act] if alcoholism or drug addiction would . . . be an contributing factor material to the Commissioner's determination that the individual is disabled."  Id.  Accordingly, the ALj did not err in his evaluation of Plaintiff's mental impairment.

34

# VIII.

## CONCLUSION

The ALJ followed the Ninth Circuit standard announced in Bustamante. He first found Plaintiff to have a severe impairment. (AR 10). He then reevaluated her, separating out the substance abuse, and determined that without the substance abuse, she was not disabled. (AR 12). He followed proper procedural steps and reached a reasonable conclusion adequately supported by the evidence as a whole. See Connett, 340 F.3d at 874. Any error in not fully considering Dr. Puglisi's brief and conclusory intake note was harmless. See Stout, 454 F.3d at 1055. Accordingly, Plaintiff's contentions do not warrant remand.

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: April 8, 2010.

_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

---

[13] This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."